MICHELE BECKWITH
Acting United States Attorney
SHEA J. KENNY
KEVIN C. KHASIGIAN
Assistant U. S. Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>REAL PROPERTY LOCATED AT 4945 CITRUS COLONY ROAD, LOOMIS, CALIFORNIA, PLACER COUNTY, APN: 032-070-056-000, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,<br><br>REAL PROPERTY LOCATED AT 628 RIO STREET, RED BLUFF, CALIFORNIA, TEHAMA COUNTY, APN: 029-423-010, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,<br><br>ALL FUNDS MAINTAINED AT MERRILL, A BANK OF AMERICA COMPANY, INVESTMENT ACCOUNT NO. 28G-22383, AND<br><br>ALL FUNDS MAINTAINED AT MERRILL, A BANK OF AMERICA COMPANY, INVESTMENT ACCOUNT NO. 28G-23921,<br><br>Defendants. | VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |

The United States of America, by and through its attorney, Michele Beckwith, Acting United States Attorney for the Eastern District of California, for its verified complaint alleges, upon information and belief, as follows:

## NATURE OF ACTION

1. This is a civil action *in rem*, brought by the United States for forfeiture of two real properties and commingled investment funds connected to, and involved in, violations of federal money laundering and wire fraud statutes.

## JURISDICTION AND VENUE

2. This action is brought by the United States of America pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C), seeking the forfeiture of real property and commingled investment funds connected to money laundering and wire fraud crimes, including the following:

    a. Real property located at 4945 Citrus Colony Road, Loomis, California, Placer County, APN: 032-070-056-000, including all appurtenances and improvements thereto, and more fully described in Exhibit A ("defendant 4945 Citrus Colony Road"),

    b. Real property located at 628 Rio Street, Red Bluff, California, Tehama County, APN: 029-423-010, including all appurtenances and improvements thereto, and more fully described in Exhibit B ("defendant 628 Rio Street"),

    c. All funds maintained at Merrill, A Bank of America Company, investment account no. 28G-22383, and

    d. All funds maintained at Merrill, A Bank of America Company, investment account no. 28G-23921.

Collectively, the "defendant assets."

3. The listed owner of defendant 4945 Citrus Colony Road is a California Limited Liability Company known as RiaDeviVeer LLC. The listed owner of the defendant 628 Rio Street is an individual known as "J.P."

4. This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345, and over an action for forfeiture under Title 28, United States Code, Section 1355(a).

5. This district is a proper venue pursuant to Title 28, United States Code, Section 1355,

because the acts giving rise to this *in rem* forfeiture action occurred in this district, and pursuant to Title 28, United States Code, Section 1395, because the defendant assets are located in or were seized in this district.

## FACTUAL ALLEGATIONS

### The "CARES" Act

6. On March 27, 2020, the United States enacted into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. The CARES Act authorized approximately $2 trillion in aid to American workers, families, and businesses to mitigate the economic consequences of the COVID-19 pandemic. This investigation thus far appears to involve one well-known aspect of the federal COVID-19 relief programs:

    A) The Paycheck Protection Program (PPP) in which third-party lenders funded forgivable loans intended to cover payroll costs, that were guaranteed by the U.S. Treasury and overseen by the U.S. Small Business Administration (SBA).

### Paycheck Protection Program

7. The CARES Act was a law passed in March 2020 intended to address the economic fallout of the COVID-19 pandemic in the United States. One source of economic relief provided by the CARES Act was the PPP, the authorization of forgivable loans up to $10 million to small businesses for job retention, payroll, and certain other expenses. PPP loans were funded by SBA-approved lenders, such as the Bank of America financial institution.

8. To obtain a PPP loan, a business must submit a PPP loan application via SBA Form 2483 or its equivalent, which is signed by an authorized representative of the business. The PPP loan application requires the business, through its authorized representative, to acknowledge the program rules and to make certain affirmative certifications regarding its eligibility.

9. The SBA Form 2483 requires the authorized representative to certify: (1) That the business was in operation on February 15, 2020, and that it had employees for whom it paid salaries and payroll taxes, or that it had independent contractors; (2) The accuracy of information and documents submitted and describes various criminal penalties for false statements; (3) The average monthly payroll

expenses and the number of employees of the business; (4) Whether any owner of the applicant business, or any business owned or controlled by the owner, has ever obtained a loan from the SBA they later defaulted on within the last seven years or that is currently delinquent.

10. These figures are used to calculate the business's eligibility and the amount of money it may receive under the PPP. Additionally, a business applying for a PPP loan must provide documentation showing their payroll expenses. Generally, a higher monthly payroll figure would suggest to the lending bank that a larger PPP loan was deserved by the applicant. Thus, if an applicant were to falsely inflate their payroll, they could obtain a larger loan amount.

11. A PPP loan application is processed by a participating lending financial institution. If the participating financial institution approves a loan application, it funds the loan using its monies, which are l00% guaranteed by the U.S. Treasury via the SBA. PPP loan proceeds must be used by the business for payroll costs, interest on mortgages, rent, and utilities.

12. To obtain forgiveness of a PPP loan, a business must submit a PPP Loan Forgiveness Application via SBA Form 3508EZ or its equivalent. The PPP allows the interest and principal on the PPP loan to be forgiven if the business spends the loan proceeds on authorized expenses within a designated period of time (usually within twenty-four weeks of receiving the proceeds) and uses at least 60% of the PPP loan proceeds for payroll. Applicants requesting loan forgiveness must typically provide supporting documentation, such as payroll records, receipts for payment of rent, or other evidence that the funds were expended on authorized business expenses. The SBA Form 3508EZ contains warnings regarding criminal penalties for false statements and the applicant must certify that all information provided is correct.

13. The SBA processed PPP loan forgiveness applications received from approved lenders or received directly from PPP recipients via the internet by servers located in Oregon. If SBA approved forgiveness of a loan, the SBA transmitted the forgiveness payments from SBA to the SBA-approved PPP lender via U.S. Treasury computer servers primarily located in Virginia. Thus, any PPP loan forgiveness application that is approved involves interstate wire communications and is covered via payment of U.S. Treasury monies.

**California Payroll Taxes and Reporting Requirements**

14. Businesses with employees operating within California are generally required to pay various taxes related to unemployment insurance and job training, as well as personal income tax withheld from employees' wages to the California Employment Development Department ("EDD"). These taxes are sometimes collectively referred to as state payroll taxes and are usually paid on a quarterly basis. Taxes and other related information are usually reported to EDD on a quarterly basis via two forms: (1) Form DE 9 *Quarterly Contribution Return and Report of Wages,* and (2) Form DE 9C *Quarterly Contribution Return and Report of Wages Continuation*.

**$3.3 Million in Disaster Funds Stolen by Claiming Fictional Employees**

15. Since early 2023, agents working for the Internal Revenue Service-Criminal Investigation ("IRS-CI") and the Federal Bureau of Investigation ("FBI") have investigated an individual, referred to herein as "Person A," and four California LLCs under their control that improperly applied for and received millions of dollars in PPP loans. Through corporate manipulation and dishonesty, Person A, and potentially others acting in concert with Person A, subverted the disaster-related focus of the PPP program by obtaining millions of dollars they were not entitled to under the CARES Act. Person A then used the millions of dollars in improperly obtained and commingled government funds to enjoy a lavish lifestyle, bankroll an investment account, and purchase a multimillion-dollar home in Loomis, California and riverfront land in Red Bluff, California.

16. Person A owns and operates AmiHR LLC ("AmiHR"), a company that provides outsourced human resource services, such as payroll, compliance training, benefit programs, and other services, to mostly small- and medium-sized business in Northern California.[1] AmiHR operates through a trio of California LLCs that Person A used to conceal and execute their criminal scheme. AmiHR, the figurehead company, was formed in 2014 and primarily assisted clients in the hospitality industry. The three other LLCs were formed in 2019, each based on the acronym "RDVK," and appear to lack a specific business purpose other than conducting banking transactions at various times for AmiHR. The

---

[1] These outsourced HR companies are known as "Professional Employer Organizations," or "PEOs." *What Is A PEO? Pros, Cons & Considerations*, FORBES (May 28, 2024), https://www.forbes.com/advisor/business/what-is-peo/ (last visited February 11, 2025).

5

1  LLCs are "RDVK," "RDVK II," and "RDVK III," and list the same residence in Lincoln, California as
2  their corporate address.

3     17.    AmiHR's human resources business provided the means and opportunity for Person A's
4  PPP crimes.  During the relevant time periods discussed below, AmiHR's clients, consisting primarily of
5  local hospitality businesses, hired AmiHR to manage their payroll operations, including biweekly (or
6  other incremental) payroll for employees.  Each payroll cycle, AmiHR's clients reported workforce
7  payroll information to AmiHR, which then processed each client's payroll data. AmiHR's clients
8  transferred funds to AmiHR for payroll and then AmiHR paid their client's employees after deducting
9  payroll-related taxes.  For their clients' employees who received payroll via direct deposit transfers,
10 AmiHR submitted final payroll files to a third-party ACH processor, which directed the direct deposit
11 payments to each employee.  AmiHR managed and controlled the transaction and money flow between
12 the client and third-party ACH processor—AmiHR's clients had zero visibility of the payment features
13 after funding payroll (i.e., transferring total payroll to AmiHR).   AmiHR's access to client employee and
14 payroll records presented Person A with a golden opportunity to exploit disaster relief funding programs,
15 as Person A later used that information to falsely substantiate PPP loan requests for payroll expenses tied
16 to non-existent employees—who were, in reality, employees of AmiHR's clients.  Below is a generic
17 representation of the scheme:



**The PPP Caper is an Immediate Success:  Person A Multiplies and Increases their Phony PPP Loan Requests, Spends Lavishly and Stockpiles Assets**

     18.    On April 20, 2020, Person A launched their PPP loan scheme by electronically signing
and transmitting a PPP loan application for RDVKIII with Bank of America.  In the PPP application,
Person A identified RDVKIII's corporate address in Lincoln, California, and that Person A was the 100%

owner. Person A originally requested $250,000 in PPP loan funds but later increased RDVKIII's loan request by over $1.8 million to $2,101,271.64. In support of the over $2.1 million PPP loan request, Person A represented to Bank of America that RDVKIII's average monthly payroll was $840,508.65. Person A signed both the initial loan application and addendum that formally increased the loan request to $2,101,271.64. Based on Person A's PPP application for RDVKIII and their representations concerning RDVKIII's payroll size, Bank of America approved a PPP loan of $2,043,516.00, which the bank disbursed to RDVKIII's business bank account, "RDVKIII x1389," on or about May 5, 2020. Three days later, on May 8, 2020, RDVKIII transferred $2 million from RDVKIII x1389 to another account held by RDVKIII at Bank of America, "RDVKIII 0274." Before receiving the $2 million transfer, RDVKIII 0274's bank account balance was approximately $2,316.

19. On January 30, 2021, RDVKIII filed a PPP loan forgiveness application for RDVKIII's PPP loan, seeking forgiveness for $1,975.053.19 of the $2,043,516.00 loan. RDVKIII's forgiveness application claimed that, from May 5, 2020 through October 19, 2020, the company spent $1,975,053.19 on employee payroll costs. RDVKIII signed the forgiveness application and acknowledged potential criminal penalties if "funds were knowingly used for unauthorized purposes," such as not using PPP funds for their intended purpose, as specified in the loan forgiveness application. On June 17, 2021, based on RDVKIII's forgiveness application, the SBA forgave the entire amount RDVKIII requested, $1,975.053.19.[2]

20. In truth, RDVKIII did not spend $1,975,053.19 on eligible payroll expenses because payroll expenses were funded by RDVKIII's clients. As an illustration, on May 5, 2020, when Bank of America transferred $2,043,516.00 in PPP loan funds to RDVKIII's bank account, RDVKIII also collected a total of $99,120.97 from at least nine clients to fund their payrolls for that cycle. The same day, May 5, 2020, RDVKIII drew on those funds to pay employees of those nine clients, keeping the $2,043,516.00 in PPP loan funds for themselves despite telling the SBA it was earmarked for "payroll."

21. RDVKIII not only falsified their PPP loan requests based on their client's payroll, but also

---

[2] Per the Promissory Note between the Bank and the Borrower, the Borrower may apply to the Bank for loan forgiveness. If the SBA confirms full and complete forgiveness of the unpaid balance of the Loan, and reimburses the Bank for the total outstanding balance, principal and interest, the Borrower's obligations under the Loan will be deemed fully satisfied and paid in full.

Verified Complaint for Forfeiture *In Rem*

misappropriated their clients' employee payroll information to achieve loan forgiveness from the SBA. As an example, some of the employees paid on May 5, 2020—by their respective employers—were later claimed as employees by AmiHR, RDVKII, and RDVKIII in their loan forgiveness applications. Person A used the illegal duplication of employee data from their clients and those nine clients later obtained their own PPP loans for the same employees they paid through AmiHR. The outcome, by design, was a government-funded gravy train to Person A, fulfilled through corrupt replication of information Person A reviewed and processed biweekly for clients. The PPP loan applications were pure fiction as AmiHR had no need for government loans to meet payroll. That is, of course, because AmiHR's clients funded their own payrolls.

22. FBI Agents obtained the PPP loan files for seven of the nine AmiHR clients involved in the May 5, 2020 payroll funding cycle. To obtain PPP loans from the government, these seven clients submitted 2019 payroll data provided to them by AmiHR, their outside payroll administrator. Some of the employees listed in the 2019 payroll data were the exact same individuals designated as employees of RDVKII and RDVKIII to fraudulently claim they spent PPP loan funds on the qualifying expense of "payroll." Based on this fiction, the PPP loans were forgiven, Person A believed the caper was complete and they could spend stolen government money however they wanted.

23. In addition, RDVKII and RDVKIII used duplicate payroll data to get the PPP loans forgiven. Notably, in the loan forgiveness applications, RDVKII and RDVKIII used payroll data from three of the same clients to fraudulently claim PPP loan funds were used on the qualifying expense of "payroll." Thus, some of the same employees were falsely used on at least two—but maybe more—different loan forgiveness applications.

24. On April 20, 2020, Person A electronically signed and transmitted a PPP loan application for AmiHR with Bank of America, identifying AmiHR's Corporate address in Lincoln, California, and Person A as the 100% owner. Person A originally requested a PPP loan amount of $28,895 for AmiHR, but later increased AmiHR's request to $929,387.56. Person A represented to Bank of America that AmiHR had average monthly payroll of $371,755.02. Person A signed the PPP application and addendum that formally increased the loan request to $929,387.56. Based on Person A's PPP application

for AmiHR and their representations concerning AmiHR's payroll size, Bank of America approved the loan request and transferred $929,327.00 to AmiHR's business account, "AmiHR x8307," on approximately May 11, 2020.

25. From December 21, 2020 to February 2, 2021, AmiHR filed six loan forgiveness applications. Person A signed one forgiveness application while AmiHR signed six others. On the loan forgiveness applications, the claimed payroll costs ranged from $946,850.39 to $1,000,530.63. The SBA denied each of AmiHR's forgiveness applications based on "the SBA conclu[sion] that the borrower did not have eligible forgiveness costs incurred during the covered period […] [a]dditionally, the SBA concludes that the borrower did not have eligible payroll cost at the time of the application […] SBA has determined that the forgiveness in the amount of $0.00 is appropriate."

26. On April 20, 2020, Person A electronically signed and transmitted a PPP loan application for RDVK with Bank of America, identifying RDVK's corporate address in Lincoln, California, and Person A as the 100% owner. Person A originally requested a PPP loan amount of $40,840 for RDVK, but later increased RDVK's loan request to $375,000. Person A represented to Bank of America that RDVK had average monthly payroll of $150,000. Person A signed both the initial loan application and addendum that formally increased RDVK's request to $375,000. Based on Person A's PPP application for RDVK and their representations concerning RDVK's payroll size, Bank of America funded a loan of $63,485, which was transferred to RDVK's business bank account, "RDVK x7501," on approximately May 14, 2020.

27. On January 12, 2021 and January 30, 2021, RDVK filed two loan forgiveness applications, each signed by RDVK. In each loan forgiveness application, RDVK claimed payroll costs equaled $219,837.69, and that, from May 14, 2020 through October 28, 2020, 100% of the PPP loan proceeds—$63,485—were used on eligible expenses, such as employee payroll costs. RDVK signed the forgiveness applications and acknowledged potential criminal penalties if "funds were knowingly used for unauthorized purposes."

28. On April 20, 2020, Person A, electronically signed, and transmitted a PPP loan application for RDVKII with Bank of America, identifying a corporate address in Lincoln, California, and Person A

9

as the 100% owner. Person A originally requested a PPP loan amount for RDVKII of $56,645 but later increased the request to $975,261.45. Person A represented to Bank of America that RDVKII had average monthly payroll of $130,034.86. Person A signed the initial loan application and addendum that formally increased RDVKII's loan request to $975,261.45. Based on Person A's PPP application for RDVKII and their representations concerning RDVKII's payroll size, Bank of America funded a loan of $291,695, which was disbursed to RDVKII's business bank account, "RDVK x1295," on approximately June 18, 2020.

29. In January 2021, RDVKII filed loan forgiveness applications, each signed by RDVKII. On each loan forgiveness application, RDVKII claimed its payroll costs totaled $780,345.78 from June 18, 2020 to December 2, 2020, and that 100% of the PPP loan proceeds—$291,695—went to eligible expenses, such as employee payroll costs. RDVKII signed each forgiveness application and acknowledged potential criminal penalties if "funds were knowingly used for unauthorized purposes."

### Inconsistencies in Tax Filings

30. RDVKIII submitted supporting records to Bank of America and the SBA related to their PPP loan. RDVKIII submitted IRS Form 941 (Employer's Quarterly Federal Tax Return) for the 1st Quarter (Q1) of 2020, claiming its 182 employees were paid $879,567.63 in wages, tips, and other compensation. RDVKIII also filed this Form 941 with the IRS, however, the California EDD has no record of RDVKIII paying wages in the 1st Quarter of 2020. In fact, EDD records show RDVKIII did not report any wages until the 3rd Quarter of 2020, meaning RDVKIII did not report any employees or wages paid during the first six months of 2020.

31. On June 25, 2020, RDVK filed its quarterly return with the EDD, covering January 1, 2020 to March 31, 2020, reporting it paid three employees a total of $30,588.35 in wages. However, in its PPP loan application, RDVK submitted two IRS Form 941s for the 1st Quarter of 2020, one signed by Person A and the other unsigned. On Person A's signed Form 941, dated April 14, 2020, RDVK claimed 56 employees, payments of $191,566.08 in wages, tips, and other compensation. This is consistent with the filing of RDVK's federal tax return. The unsigned and undated Form 941 claimed RDVK had 26

employees and paid $304,741.07 in wages, tips, and other compensation, and was not filed.

**Depositing, Moving, and Investing the Stolen PPP Funds**

32. In a two-month span in 2020, Person A and the LLCs under Person A's control received over $3.3 million in PPP loans they were not entitled to:

| Company | Date | Amount | Dep. Acct. |
|---|---|---|---|
| RDVK III | May 5, 2020 | $2,043,516 | BofA x1389 - RDVK III |
| AmiHR | May 11, 2020 | $929,327 | BofA x8307 - AmiHR |
| RDVK | May 14, 2020 | $63,485 | BofA x7501 - RDVK |
| RDVK II | June 18, 2020 | $291,695 | BofA x1295 - RDVK II |
| **Total** | | **$3,328,023** | |

33. In May 2020 and June 2020, over $3.3 million in PPP loans were transferred to Person A and the California LLCs under Person A's control, and then commingled and consolidated to personal bank and investment accounts controlled by Person A and Person B.  Approximately $2.8 million in PPP loans remained in Person A's and B's accounts until April 2021, when they purchased real property located at 4945 Citrus Colony Road in Loomis, California.  On April 19, 2021, Persons A and B closed escrow on 4945 Citrus Colony Road, transferring $560,880.06 to Fidelity National Title for the purchase. The $560,880.06 is traceable to the commingled bank account held by Persons A and B to stockpile the improperly obtained PPP loans.

34. In 2022, Persons A and B transferred title to 4945 Citrus Colony Road to Person A's family member via quitclaim deed for $0.  On the same day, Person A's family member transferred title to 4945 Citrus Colony Road, also via quitclaim deed for no value, to RiaDeviVeer LLC, a California Limited Liability Company created and controlled by Person A.  According to Placer County building records, Person A obtained a permit to construct a luxury home at 4945 Citrus Colony Road and is currently in the process of obtaining final approvals for the structure from Placer County building officials.

35. In August 2021, Person A's brother was in escrow to purchase a second property, a

11

riverfront parcel of developable land at 628 Rio Street in Red Bluff, California. On August 31, 2021, Person A wired $99,000 from the commingled PPP bank account to Fidelity National Title for the purchase of 628 Rio Street in Red Bluff. Person A's brother—an individual known as "J.P."—was listed as the owner of 628 Rio Street.

36. On January 18, 2022, $4 million in commingled PPP funds was transferred from RDVK x0274 to RDVKIII's Merrill Lynch brokerage account, "RDVKIII x2064." In February and March 2022, the $4 million in commingled funds moved from RDVKIII x2064 to Person A's Merrill Lynch brokerage account, "PA#1 x2383," and, in January 2024, $2.5 million of that $4 million moved to a second Merrill Lynch brokerage account held by Person A, "PA#2 x3921." In late 2024, Person A's two Merrill Lynch brokerage accounts, PA#1 x2383 and PA#2 x3921, held significant balances of commingled and stockpiled PPP funds.

37. Per the loan forgiveness applications, the covered period refers to the period during which the Borrower's PPP loan funds must be used for eligible forgiveness purposes to be eligible for the full forgiveness. The covered period for all four PPP loans ended by at least December 31, 2020. As noted above the four companies had a combined total of at least $2.8 million (approximately 84% of the total in PPP loans) in PPP funds in the bank account ending in x0274 (RDVK III) until at least April 19, 2021. Therefore, at least $2.8 million in PPP funds were not used for eligible forgiveness purposes during the covered period.

**FIRST CLAIM FOR RELIEF**
**18 U.S.C. § 981(a)(1)(C)**

38. The above paragraphs are incorporated by reference as though fully set forth herein.

39. The United States alleges that the defendant assets were derived from proceeds traceable to an offense constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), which incorporates the definition of "specified unlawful activity" found in 18 U.S.C. § 1961(1) and are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C). Wire Fraud in violation of 18 U.S.C. § 1343, constitutes "specified unlawful activity" as defined in § 1961(1).

**SECOND CLAIM FOR RELIEF**
**18 U.S.C. § 981(a)(1)(A)**

40. The above paragraphs are incorporated by reference as though fully set forth herein.

41. The defendant assets, including any right, title and interest in the whole of any lot or tract of land and any appurtenances or improvements thereon, are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because they were involved in a transaction or attempted transaction in violation of sections 1956 and 1957 of Title 18, an offense punishable by more than one year's imprisonment.

42. The United States does not request authority from the Court to seize the defendant real properties at this time. The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1):

    a. Post notice of this action and the Complaint on the defendant real properties,

    b. Serve notice of this action on the defendant real property owners along with a copy of this Complaint; and

    c. File with the county where the defendant real properties are located a lis pendens providing notice of the properties' status as defendants in this *in rem* forfeiture action.

43. Title 18 U.S.C. § 985(c)(3) provides that, because the United States will post notice of this Complaint on the defendant real properties, it is not necessary for the Court to issue an arrest warrant *in rem*, or to take any other action to establish *in rem* jurisdiction over the defendant real properties.

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that:

1. Process issue according to the procedures of this Court in causes of action *in rem*;

2. Any person having an interest in said defendant assets be given notice to file a claim and to answer the complaint;

3. The Court enter a judgment of forfeiture of said defendant assets to the United States; and

///

///

4.  The Court grant such other relief as may be proper.

Dated:  2/14/2025                    MICHELE BECKWITH
                                     Acting United States Attorney

                            By:      /s/ Kevin C. Khasigian
                                     KEVIN C. KHASIGIAN
                                     Assistant U.S. Attorney

# VERIFICATION

I, Clint Wares, hereby verify and declare under penalty of perjury that I am a Special Agent with the U.S. Department of the Treasury, Internal Revenue Service – Criminal Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States and information supplied to me by other law enforcement officers, together with others, as a Special Agent with the U.S. Department of the Treasury, Internal Revenue Service – Criminal Investigation.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: February 14, 2025

/s/ Clint Wares
CLINT WARES
Special Agent
Internal Revenue Service – Criminal Investigation

(Signature retained by attorney)

# Exhibit A

Real property located at 4945 Citrus Colony Road, Loomis, California

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF PLACER, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

THAT PORTION OF THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 32, TOWNSHIP 12 NORTH, RANGE 7 EAST, M.D.M., DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 32; THENCE WEST ALONG THE SOUTH LINE OF SAID SECTION 32 A DISTANCE OF 333 FEET TO THE SOUTHEAST CORNER OF THE TRACT OF LAND DESCRIBED HEREBY, THE POINT OF BEGINNING; THENCE NORTH FROM SAID POINT OF BEGINNING, PARALLEL WITH THE EAST LINE OF SAID SECTION 32, A DISTANCE OF 852.00 FEET; THENCE WEST 493.90 FEET; THENCE SOUTH 0 DEG 01' 30" WEST 852 FEET, MORE OR LESS, TO THE SOUTH LINE OF SAID SECTION 32; THENCE EAST ALONG THE SOUTH LINE OF SAID SECTION 32, A DISTANCE OF 494.27 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS NOW OR AT ANY TIME HEREAFTER IN OR UNDER SAID LAND AS RESERVED BY BANK OF AMERICA, NT & SA, IN DEED RECORDED MAY 27, 1944 IN BOOK 447 OF OFFICIAL RECORDS, PAGE 202, PLACER COUNTY RECORDS, AND AS FURTHER SET FORTH IN QUITCLAIM DEED FROM CAPITAL COMPANY, RECORDED APRIL 21, 1960 IN BOOK 833 OF OFFICIAL RECORDS AT PAGE 123, PLACER COUNTY RECORDS.

BY DEED FROM CAPITAL COMPANY TO DAVID E. WOOD, ET UX, RECORDED APRIL 21, 1960 IN BOOK 833 OFFICIAL RECORDS, PAGE 123, PLACER COUNTY RECORDS, ALL OF SAID COMPANY'S EASEMENTS AND RIGHTS OF WAY AND OTHER RIGHTS TO THE USE AND OCCUPANCY OF THE SURFACE OF THE ABOVE-DESCRIBED LAND WERE RELEASED AND SURRENDERED FOR A DISTANCE OF NOT MORE THAN ONE HUNDRED FEET (100') IN DEPTH.

PARCEL TWO:

A NON-EXCLUSIVE EASEMENT FOR THE PURPOSE OF INSTALLING AND MAINTAINING WATER PIPELINES OVER, UNDER, AND ACROSS THE STRIP OF LAND 10 FEET IN WIDTH SHOWN AND DESIGNATED AS "AREA K" ON PARCEL MAP NO. 70010 FILED FOR RECORD IN THE OFFICE OF THE COUNTY RECORDER OF PLACER COUNTY, CALIFORNIA ON MAY 11, 1972 IN BOOK 1 PAGE 92, AS RESERVED BY FRED J. FLETCHER IN THE DEED OF JAMES LEE DENTLEY, ET UX, DATED MAY 9, 1972 AND RECORDED MAY 12, 1972 IN VOLUME 1418 OF OFFICIAL RECORDS AT PAGE 132, PLACER COUNTY RECORDS.

Verified Complaint for Forfeiture *In Rem*

PARCEL THREE:

AN UNDIVIDED 1/8TH INTEREST IN AND TO THAT CERTAIN EXISTING WATER PIPELINE GENERALLY LOCATED ACROSS PARCEL A AS SHOWN ON THAT CERTAIN PARCEL MAP NO. 70010 RECORDED MAY 11, 1972 IN BOOK 1 OF PARCEL MAPS AT PAGE 92 AND INDICATED AS "EXISTING WATER LINE".

APN: 032-070-056-000

**Exhibit B**
Real property located at 628 Rio Street, Red Bluff, California

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF RED BLUFF, COUNTY OF TEHAMA, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:
The North 20-1/2 feet of Lot 3 and all of Lots 4 and 5 in Block A of the Town (now City) of Red Bluff, as the same are shown on the map filed in the Tehama County Recorder of the County of Tehama, State of California, May 29, 1878 in Book A of Maps at page 79.

Excepting therefrom a parcel of land in the City of Red Bluff. Tehama County. California, and being all that portion of Lots 3, 4 and 5, Block A as said lots and blocks are shown on the map filed May 29, 1878 in Book A of Maps at page 79. Records of Tehama County, California, that is more particularly described as follows:

All of Lots 4, 5 and the North 20.5 feet of Lot 3, Block A of said lots and blocks are described in the Deed from Edward F. Kraft to City of Red Bluff, dated May 10, 1919, recorded June 24, 1919 in Book 97 of Official Records at page 440, Records of Tehama County, California, lying between the following described line and the mean low water line of the Sacramento River.

Beginning at the Northwest corner of Section Twenty (20), Township Twenty-Seven (27) North, Range Three (3) West, Mount Diablo Meridian, thence South 13° 10' 23" East, 2,048.4 feet, thence South 48° 07' East 155.8 feet, thence South 41° 27' East 125.4 feet, thence South 53° 37' East 165.2 feet, thence South 56° 32' East 137.8 feet, thence South 61° 42' East 88. 6 feet. thence South 56° 42' East 80.2 feet, thence South 49° 38' East 78.7 feet, thence South 42° 23' East 108.3 feet, thence South 24° 15' East 99.8 feet, thence South 29° 05' East 152.2 feet, thence South 39° 45' East 154.8 feet, thence South 49° 13' East 143.9 feet, thence South 33° 22' East 49.1 feet, thence South 14° 02' East 53.6 feet, thence South 44° 04' West 43.1 feet, thence North 68° 01' 13" East, 1,220.9 feet to the center of aforesaid Section 20.

TOGETHER WITH a non-exclusive easement over. under and upon a strip of land with the uniform width of 25 feet for the limited purposes of (1) ingress and egress from Pine Street to, and (2) for the installation, location, access to and maintenance of utilities adjacent and parallel to the Easterly boundary of the below described parcel. Said easement runs from Pine Street to the North line of Lot 5 of said Subdivision.

The Westerly 140 feet of Lot 6 in Block A of the Town (now City) of Red Bluff, as the same are shown on the map filed in the Tehama County Recorder of the County of Tehama, State of California, May 29, 1878 in Book A of Maps at page 79.

APN: 029-423-010

Verified Complaint for Forfeiture *In Rem*